And we'll move to the fourth and final case of the day, which is 21-11, 416, Bastias v. U.S. Attorney General. And I see we've got Mr. Prada here for the appellant, Mr. Pennington here for the appellee. Mr. Prada, whenever you're ready, but no hurry. Good morning, and may it please the Court. As this Court has previously held, the application of 1227e2 to this exact crime produces results that are onerous and, at its core, inequitable. The Supreme Court has taught us recently that there is a need to exhaust all the traditional tools of statutory construction to determine whether ambiguity exists in a statute. This is a rigorous analysis that must be employed. In Kaiser, the Court explained that there's another step, it could be a step one, maybe a step two, or both, analysis where you determine what is the zone of ambiguity in a statute. So, for example, in this statute, the word child abuse, neglect, and abandonment may not be defined, but the fact that the words crime and convicted of are in the statute as well, that points the Court's analysis to a tailor analysis. Let me ask you a question here. Aren't we bound by what our predecessor court said in Pierre on this first question of whether or not the statute is silent or ambiguous on the issue? Pierre, in note three, noted that this exact issue about the negligence was not being decided in that case. Now, Pierre did state that the word was undefined, so that may state that there's a latent ambiguity. Let me just stop you for a moment. I want to read to you exactly what the Court said in Pierre because I think it is important that if Pierre resolves the first question, the first prong of Chevron analysis, the only issue before us would be the reasonableness of the agency's determination. They write in Pierre, the INA does not define child abuse, citing Velazquez Herrera, because the statute is silent on the issue. We may defer to the BIA's interpretation of the INA so long as that interpretation is reasonable and consistent with the statute, citing Chevron. And then the Court goes on to spend a great deal of time discussing whether or not a determination was reasonable. I read Pierre, and I may be mistaken here, but I read Pierre as having settled the first question, leaving us only with the power to address the second question. Am I wrong? I guess the question becomes, what does it mean when we must determine the zone of ambiguity? In Kaiser, which is in our case, but I believe the Court noted that they would apply in the Chevron context as well. The first step is to determine if there's an ambiguity that exists. And next, you would determine what is that zone of ambiguity. But just to be clear, you understand Judge Marcus's question is that in Pierre, we have precedent that says three judge panels, you heard it in the last argument, three judge panels are bound by what earlier three judge panels have done unless those decisions have been abrogated by intervening Supreme Court precedent or reversed in bank. And Pierre, same statute, looks at this and says, undefined, ambiguous, moving on to step two. Rightly or wrongly? Maybe wrongly. It does state that. Now, there are limitations in Pierre. It says to the extent of the crime involved in Pierre, which was a very different crime. In the footnote three that I was referencing, the Court found it very important that that crime of expelling excrement on a child requires an overt act. And one of the definitions of an overt act is that it's an act that implies an intent, from which you can infer an intent. So I believe that that statute requires more than just simple negligence. And in that same footnote, the Court noted that this issue about what the time circuit held in Ibarra and in the Second Circuit case would not be resolved in that. So what I'm trying to convey is that you have that initial finding that there is ambiguity. Just to cut right to the chase, your view is we're not bound by Pierre and it's an open question about whether the statute is clear and unambiguous or silent and ambiguous. And you would have us answer that question. Do I have that right? Yes. And I think there's two ways to view it. It could be a step two analysis or it could be an extension of the step one analysis. It's a different analysis. Yes. Whether we go to step two, there we ask a different question. Assuming arguendo that the statute was silent and ambiguous about the definition of the critical term, was the agency's determination a reasonable one? That is a different question from whether or not the statute is silent. So help me. Just speaking for myself, it seems to me right or wrong, I'm bound by Pierre on the first question, which leaves me to debate, analyze question two. Was the interpretation a reasonable one? Not necessarily the best one, but one that reasonable jurists could fairly say they get a lot of thought to it. They use principles of statutory interpretation. They looked elsewhere for other definitions in other statutes, federal and state, et cetera. And if they did all of that, even if they reached a result that I might not agree with, wouldn't it be reasonable? So help me with prong two. Tell me why what the agency did here was not a reasonable effort at interpreting a statute that was silent on the definition of the critical term, crime of child abuse. So under step two, I think there's two ways to find that an agency reading is not permissible. One is that it's unreasonable. Maybe arbitrary and capricious would be the analogy. But the other is, what is the range of permissible decisions that could be allowed? So that's the zone of ambiguity test in Kaiser, that the court said you apply all these tools, you determine whether there's ambiguity. Once you have determined that, you determine the zone of the ambiguity. And then you reach the reasonableness argument. So the zone of ambiguity test, maybe it's part of the step two test or something in between. But our argument is that when you look at the words convicted, which calls for a generic offense to be defined, and the word crime under Taylor, that limits the universe of permissible decisions. So what we're saying is that because we're not looking to just any act of child neglect, abuse, et cetera, we're looking to crimes. That's why the Taylor approach is required at the step two analysis. So maybe Taylor's not there to find full, perfect clarity. But it does apply to tell us what is the zone of permissible decision making. Let's just go further then. The BIA observes that at least six states referred to child abuse as including criminally negligent acts in 1996 at the time of the codification. So they made some effort to look elsewhere. I think it's fair to say that the bulk of the states did not draw the same kinds of codifications. But they looked elsewhere, did they not? And did they not also look at federal statutes, some civil but some criminal, to help define the term? So with regard to the federal statutes, the majority were in Title 42. I believe there was an Indian statute under Title 25. I'm not sure if that's purely civil or not. But two points. One, under Taylor, you shouldn't be looking at civil statutes at all. And number two, under Taylor, you're looking for the majority approach. Because the point of adopting the majority approach is that certain conduct, which would not be a crime in the majority of states, would make you deportable if you have the happenstance of living in the minority states that make it a crime. So it does not promote the value of uniformity in federal law. But once we're beyond Step 1, whether we're at Kaiser Step 1.5 or Chevron Step 2, the agency, I mean, the point of it, right, is that the agency is entitled to make a policy choice. And there's this split. Maybe it's a lopsided split. But the agency says, well, there are a lot of people who do that and a few people who do that. And there's no sort of uniform way to understand this. And so we're going to do that. So I would say that when we're talking about crimes that are beyond non-injurious and negligent, say recklessness, or where we look at the amount of risk involved, which is great bodily harm or is it risk to health of a lesser nature, those type of decisions would be in the discretion of the board. So thinking of it as a Venn diagram, let's say, the outer limit, what we're arguing for, is the non-injurious criminally negligent crimes. Anything above that, the board can go as broadly as it wants or it can contract. Let me ask you this. What about forgetting about counting noses among states? What about the fact that the federal statute refers to child abuse or child neglect, right? And now the question is whether culpable negligence is child neglect. And so we've got a federal statutory term and a negligent interpretation or sort of state rule. Why isn't it at least permissible for the agency to say, I don't know my Latin, but to say I'm guessing those two terms derive from the same root? Is that reasonable? I think you mean like etymologically. But I think what we do is when we look at crimes, child neglect is often a failure to provide care to the point that a child is not maintaining their health, whereas endangerment crimes are something else. And in the Ninth Circuit case, when they did their 50-state survey, they did a much narrower survey and they looked only to endangerment offenses. And the Ninth Circuit explained that there was reason to believe that Congress was not contemplating pure endangerment offenses where there's actually no injury. So, for example, the Florida statute, there's two ways. I have it in the appendix. There's two ways to violate the statute. There's a failure or omission to provide care to the point it affects the child's health, but there's also a failure to protect. So the failure to protect is the lower offense. It's an endangerment crime. It's not one where the failure to provide care has led to an injury. And since that portion of the statute is not divisible, we're claiming that the subsection 2D of the Florida statute is overbroad at that point. And I see my time is running low. Let me ask you before you sit down just one other thing on this. As I read the comparable case law elsewhere, there are at least three circuit courts of appeals, the second, the third, and the fifth, that reached the opposite conclusion from Ibarra, holding that the BIA's definition was reasonable with respect to criminally negligent child endangerment offenses. They might be right. They might be wrong. You can quarrel with them. They occur both before and after the critical Supreme Court case. But does that not also bear upon whether the analysis by the BIA was a reasonable one? I would suggest no, and I'd like to go through each case one by one and explain why not. The Third Circuit case Mondragon, there's a footnote three in there where they state that even if they were to agree with the Ibarra test, that that person's crime would still qualify as a removable offense because it was an intentional act of communication, if I recall, for the purpose of sexual abuse. So this is not a negligence crime where there's no injury. This is a much greater offense. We're arguing for a much narrower rule and has been argued in that case. And as the Third Circuit itself suggested, there might not even be a split with Ibarra from the Tenth Circuit. The Fifth Circuit's case, one, I believe there was not a sufficiently rigorous analysis, but even then it's distinguishable because the crime in there required deliberate acts of sexual conduct. I think it was a statutory rape case, if I recall correctly, where the child was impregnated. Again, this was done with intent. You don't impregnate a child through negligence. This is not the same type of crime. The rule being argued in that case is not. One thing that the Fifth Circuit zeroed in on was that, in their view, the board's interpretation of the statute was wholly consistent with the purpose that lay behind the statute itself. So they looked at purposeful analysis to determine meaning as well. I don't mean to hold you. You'll have some rebuttal time. All I'm raising with you is that you do have three courts of appeals who do go the other way for various reasons, some wholly on point, some a little bit different but still bearing on the same issue. You might just reflect on it when your colleague gets up and come back on rebuttal and tell me why this body of law doesn't suggest that it's a fairly debatable question and reasonable folks can look at it in an arguably different way and still fall within the ballpark of reasonableness. Yes, if I may very briefly, Your Honor. I would say that those crimes were not negligence crimes. The rules being argued there were broader than the rules we're arguing for. These cases, there's not really much of a split to that extent because of the rule we're seeking to adopt. The Fifth Circuit analysis did not discuss Taylor. It just assumed that because the statutory term of abuse was undefined, that was enough. In the Second Circuit case, they took the position that nothing required Taylor to be applied with an agency. I believe when the agencies interpret a statute, the tools of construction are the same that the court would use. In Esquivel-Quintana, which was a BIA case about sexual abuse of a minor aggravated felony, both adopted at the same time in Ibrara, the Supreme Court used the Taylor approach to define the term to find no ambiguity at all. To that extent, I think Esquivel-Quintana undermines the Pierre case. Got you. Thank you, Your Honor. Thank you. All right, Mr. Pennington, let's hear from you. Thank you, Judge Newsom, and good morning, everybody. Greg Pennington for the Attorney General. The government believes that the court is bound by Pierre at step one on whether the statute is ambiguous. I think Pierre, the language Judge Marcus cited, was pretty clear, saying that the statute is silent and the board has the authority to interpret. Let me ask you a question. I accept that I'm bound by it, but Pierre wrongly decided in light of what the Supreme Court subsequently said. For that matter, previously said in Esquivel-Quintana. Well, Esquivel-Quintana dealt with a different statute on sexual abuse of a minor aggravated felonies, and just whether the federal statutes were clear on whether the age of the victim had to be 18. But the analysis in the two cases is totally different, right? Esquivel-Quintana begins likewise with the premise the statutory term is silent, ambiguous. And then goes through this very rigorous analysis of ordinary meaning and other statutes and counting noses to conclude at step one that the statute has a meaning. And in Pierre, there's not even a college try to figure out what the statute means at step one. I mean if you blink, you miss it. They're right through to step two right away. Are those two things consistent? Well, you're talking about Chevron 1.5, right? The step 1.5. Maybe it's just one. So, I would say that Pierre was different because it dealt with statutory language that wasn't defined in other federal statutes. And so, I think there was enough effort in Pierre that the Supreme Court. Just so I'm clear, I haven't found it. I read Pierre, and I can't figure out what the effort was at step one. That the statute doesn't define the terms. The statute has a meaning. I mean Esquivel says it's silent, and so let's figure it out, right? And the court goes through this very rigorous analysis of looking at dictionaries and other statutes and sort of the tally of the states. None of that in Pierre. And of course, the Supreme Court concludes it's not ambiguous. Right. Well, under the prior. It seemed to me, just speaking for myself, that that analysis would be more properly applicable to the second prong, which is something that your colleague here is suggesting. That the way the Supreme Court approached question one is meaningful and bears on how you approach question two. At the end of the day, I agree with you that we're bound by Pierre. I was just asking you whether the approach in Pierre, which I suppose the best way to put it is it's the soul of brevity. Whether that's really consistent with the way the Supreme Court came at this question dealing with a different section of the law. Admittedly, it's not the same statutory framework. But that's not what we did in Pierre. Right. And I could point to other Supreme Court cases like Negussie, which dealt with the persecutor bar, where they also found the statute was silent. But they believed that the board then went on to misapply the law and sent it back for it to have a second shot at it to determine whether it was reasonable at step two. I guess what Judge Marcus and I are asking, I think, is do you think it's fair to say that the trajectory of Supreme Court jurisprudence in Chevron land is toward a more rigorous analysis at step one? More tools brought to bear at step one? I think that's fair to say. And Pierre doesn't really reflect that. It does not. I believe Pierre did kind of look at how other terms in that same statute, 1227A2EI, neighboring terms to the child abuse, child neglect, and child abandonment are defined in the statute to say that, well, this one isn't. Therefore, it is silent. Could it have been more rigorous at step one under the way the Supreme Court's going? Maybe so. But I don't think the Supreme Court's decision in Esquivel-Quintana or Kaiser is so forcefully abrogated Pierre. I accept the proposition that Pierre is controlling the law. It hasn't been abrogated by what the Supreme Court said in that other case or those other cases. Nevertheless, your colleague argues additionally, and I'd like you to address it for me, that even assuming arguendo that Pierre prong one is controlling on this circuit, the analysis the Supreme Court used bears very much upon how we resolve question two, the reasonableness analysis. And there, among other things, the Supreme Court counted noses. They counted heads, and they said, okay, you've got 50 state legislatures. What did they do in defining the term? Your colleague says if we do that here, it is a distinct minority of states that take the position that the BIA adopted. Maybe it's six. Maybe it's nine. At best, it's 20 percent of the whole, and if you use that methodology, you might come up with a different answer on reasonableness. Is that a fair way to approach this question too? Well, there's no mandate that the agency use any specific tools of statutory construction, although the Supreme Court did it in Esquivel-Quintana. Here, the board looked at a variety of factors, not just a 50-state survey. There's nothing that says in order to be reasonable, the board has to look at every law in every 50 states. The board did so much more here, and I would say that Pierre also did all the legwork on step two as well. Pierre looked at the board's decision in Velazquez-Herrera as to what constitutes child abuse. It looked at the board's subsequent decision in Matter of Sorum, which said, oh, we forgot about the other words in the statute. There's also child neglect and child abandonment, so it's not just crimes where injury to a child is inherent. We also need to consider neglect-type crimes and abandonment-type crimes. So that's when it announced that unitary concept. Abandonment, neglect, and abuse are all predicated by a crime. So the board looks and says, well, we're also going to consider endangerment-type crimes, neglect-type crimes, so long as, and what it later clarified in Mendez-Osorio, so long as there is a sufficient likelihood that harm will befall the child. And so in Pierre, the court went through all the legislative history that the board relied on, the state survey it did, the other statutes it looked at. Let me stop you on that. Your colleague noted about that, that the BIA wrongfully considered civil statutes too, that that should not have gone in the mix. Is he right about that? No. Would that be an error of law on the part of the BIA? No. Again, there's no mandate that the board consider any specific thing or any agency consider any specific thing under Chevron, so long as it is a permissible construction of the statute. And I think the overarching goal of the board here was the congressional intent. In 1996, when they passed this law, prior to that, there were no removability offenses for crimes against children. And in 1996, Congress made specific several different removable offenses. And then it went to look at federal statutes, civil and criminal, as to what child abuse might mean. And I think one of the statutes, which was a criminal one, was state requirements to report child abuse to the federal database. And it defined child abuse as including negligence-type crimes. So, and again, these were all things that were kind of run through briefly in Pierre, but nonetheless run through in the court coming to its ultimate conclusion that it was a reasonable interpretation of the statute. And I would argue that Pierre only left open the door in that footnote as to whether the Ibarra court got it right in the Tenth Circuit. Let me ask you this. What role, if any, maybe I'm too fixated on the fact that the federal statute includes the word neglect, and the Florida law criminalizes culpable negligence. Those neglect and negligence to me sort of like map up, as he said, etymologically. What role, if any, does that play, whether we're at step one or step two, but certainly at step two in sort of the reasonableness soup? I certainly think that contributes to whether the agency's decision was reasonableness, and that's why I italicized it in my brief. I think that that statutory language signals that Congress clearly wanted neglect-type crimes to fall into it. And so the board was left to say, well, what neglect-type crimes? And that's where it has a clear limiter. And even, you know, the court expressed some reservation about, we don't need to consider purely negligent, no injury to a child, whether that would qualify. The board's definition doesn't reach that far. The board's definition only reaches to conduct that is at least criminally negligent. And if there's no actual harm to a child, there has to be some reasonable probability of harm or death to a child in order to qualify. And I would say that the California statute that the Ninth Circuit's going to hear on Bonk in a couple weeks is a good example of this line drawing. So California has a misdemeanor and a felony. The wording is almost identical, except for the misdemeanor, there doesn't have to be any risk to a child, whereas the felony has a significant risk of death or injury to a child. And so under the board's definition, that misdemeanor would not qualify, whereas the felony does. And so, you know, the Ninth Circuit, when it first came out in Martina Cedillo, said that the board's definition is reasonable, but that petitioner died during the course of the En Bonk proceeding. And so a separate panel later decided it was unreasonable, and that's the case the court's going to hear on Bonk. But there is a clear limiter, and I think that also contributes to the reasonableness of the agency's determination. It's not just as long as there's a conviction against a child. There's several statutes. I looked at a Georgia statute, child endangerment, where it uses ordinary negligence language, failure to exercise care resulting in endangering the child. That wouldn't qualify under the board's definition. So I think that all of those different steps that the board has used in its step two analysis contribute to the reasonableness. And Judge Marcus, I think you're right, too, that three courts of appeals have agreed, and the Tenth Circuit post-Ivara also deferred to the board's definition in Zarate Alvarez, as long as there was that additional risk to a child included in the definition. They said that, well, now there's some limits on it. We see some limits. Now we hold that it's reasonable. So now you have four courts of appeal that have at least deferred either entirely or mostly with the board's definition. And so I think the court should hold that it is bound by Pierre, remove any limiting language like Pierre had, and say that the board's definition is reasonable as it is expressed through its four decisions into 2020, full stop. And I think that will provide clarity for future panels. You don't have to say it's reasonable as applied to this statute and it's reasonable as applied here. You have a reasonable definition provided by the agency. Now let's move on to see whether that state conviction matches, whether there is at least criminal negligence and actual injury to a child, either emotional or physical, and if not, whether the statute as an element requires a significant risk to that child. And once you get there, I think that if the court holds that the board's definition is reasonable, I don't think there's any argument to be made that this Florida statute doesn't match. It requires willfulness or culpable negligence, and the statute defines neglect as requiring, through act or remission, a significant risk to the child's well-being, either through death or serious injury. So for those reasons, we think the court should deny the petition for review. See, I have a few minutes left. If there are any other questions about the Florida statute, I would say that if the court wants to keep its reservation in Pierre, which the government believes it should not, that, again, this is not a, quote, purely negligent with no injury to a child statute. This is something more akin to reckless conduct where there's a substantial risk of injury. So for these reasons, we ask the court to deny the petition for review. Very well. Thank you so much. Mr. Prada, you've got three minutes remaining. Can I ask you just at the outset, and we're not counting your time against you yet, do you agree that if the board's construction interpretation is reasonable, then the Florida statute fits? Are we really just debating the reasonableness of the board's interpretation here? I think that was what happened in the Martinez case, and Judge Marcus was on that panel and found that it did fit. When you look at Saram saying that there is no injury required, that's what's the Florida statute. There's no injury required. And also Velazquez reaches negligence crime. So I think that has already been decided, even though non-presidential. So I just want to get to the point. I think the government's agreeing that Pierre doesn't actually foreclose this because it did leave the issue open, and there's a few reasons why. I want to answer your question about the title of the offense under Florida law. Under the categorical approach, the label that a state gives to a crime is not dispositive. You look to the elements of the crime and you compare it to the generic offense. And as was discussed earlier, there's actually two types of crimes under Florida's definition. There's a traditional neglect crime where failure to provide causes injury, but there's also an endangerment crime. And the Ninth Circuit's original panel decision gets into that and explains that the statute never includes endangerment crimes. And I think what the BI is doing by trying to invoke this unitary concept is trying to expand the meaning of the individual words that Congress actually used. We're not bringing that issue to the court. It hasn't been briefed, but I think that is an important point, that maybe there's something wrong with that. Returning back to Judge Marcus's questions about whether this is Step 2 or not, you can have a given provision in a statute, and you could say, this word is ambiguous, but there's other words. And just because one word is ambiguous does not make them all ambiguous. So in Pierre, the court was saying the word child abuse is the ambiguous word, and abandonment and neglect, right? Because the states do have their variations. So you could say 27 states say it's one thing, 21 say another, and those are roughly majority. And I think the board may have discretion in that point, especially with the Actus Reis, which my friend has been discussing about the high risk of harm, like in the Zarate case. Because Zarate doesn't undermine Ibarra. Zarate had an offense with recklessness. It's a higher standard than negligence. And they also said it was recklessness plus a high risk of harm, leaving the door open that a pure recklessness crime without a necessarily high risk of harm might not actually trigger the statute. And I believe Mendez-Osorio states the same about when you're looking at that portion. But we're focused here on the mens rea, whether negligence on its own with no injury counts. And in 1996, whether they called it endangerment or many various names because what the Tenth Circuit did was they looked at many crimes regardless of the label and at the elements, and they found that as a whole, negligence without injury was not a crime in the states. It was maybe 12% of the states that would make it a crime at that point. And just if I may, one last point about the zone of ambiguity test. Maybe that is a properly within step two because when you say a statute is ambiguous to an extent, which is the words in Pierre to an extent, about one specific word, that doesn't say anything about the word crime, which was not discussed in Pierre. And we're arguing that the word crime puts outer limits on the ambiguity that exists. And that is our argument, Your Honors. Thank you for your time. Thank you so much. Interesting case, well argued on both sides. We appreciate your help. That case is submitted, and we will stand in recess until tomorrow morning at 9 a.m.